**Patricia HENNON and New Bern Molding Co., Plaintiffs,**

v.

**KIRKLANDS, INC. and World Bazaars, Inc., Defendants.**

Civ. A. No. 94–0063–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Nov. 28, 1994.

John M. DiJoseph, Nicholas A. Pappas, Sattler & DiJoseph, Nicholas A. Pappas & Assoc., Fredericksburg, VA, for plaintiffs Patricia Hennon, New Bern Molding Company.

Anthony O. Cormier, Law Office of Anthony O. Cormier, Woodland Hills, CA, for defendants Kirklands, Inc., World Bazaars, Inc.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This case is before the court upon Plaintiffs' motion to preliminarily enjoin the Defendants from infringing the Plaintiffs' copyrights in several Dickens carolers figurines. The court conducted a hearing on November 18, 1994, whereupon the parties presented evidence and argument. Based upon the record before the court, the motion for a preliminary injunction is denied for the reasons stated herein.

### I.

Patricia Hennon and her husband, James Hennon, produce Dickens carolers figurines by hand in New Bern, Virginia, doing business as New Bern Molding Company. The Hennons' figurines are sold as part of the "Cedartown Christmas Collection." The Hennons primarily sell their carolers to dealers at crafts fairs and by mail, at wholesale. The Hennons also sell their figurines at retail stores in Wytheville, Roanoke, and at a temporary store in Charlottesville, Virginia, that is open before the Christmas season. The Hennons first started marketing their figurines as "PJ's Carolers" in 1985. At all times, their carolers have included copyright notices. Each caroler has a sticker affixed to the base with the name of the figurine; the name of Patricia Hennon, the artist; and the logo "Dickens Cedartown Carolers/By PJ's of Newbern, VA." Though the Hennons have not submitted evidence of a copyright registration, it is uncontradicted that they recently registered their figurines with the Office of Copyright.

Sometime after Christmas, 1994, the Hennons received word that World Bazaars was merchandising cheap "knock-offs" of the Hennons' carolers at trade shows and at Kirklands stores under the name "Cedar Town Carolers." The Hennons sought out the "knock-offs" at trade shows and at stores in the Western District of Virginia. Once the Hennons compared the two lines of carolers, they brought this suit for copyright infringement. The Hennons claim that their business has fallen off by as much as thirty percent because they cannot compete with the low price of the Chinese-made figurines sold by the Defendants. Whereas the Hennons' carolers retail at $30.00 to $50.00 each, the Defendants' carolers retail at $10.00.

World Bazaars is a major importer and national retailer of merchandise. Neither World Bazaars nor its associated company Kirklands manufactures products. World Bazaars has large gift stores around the country that sell otherwise high-priced gift items at reduced prices, by importing cheaper versions of more expensive merchandise and selling merchandise in large volumes. Kirklands has smaller stores, that are often located in areas such as shopping malls, and sells gift items similar to those sold at World Bazaars. Both Defendants have stores around the country. The value of the merchandise at issue in this case is over $100,-000.00, and the Defendants' potential lost profits if an injunction is issued, during the height of the Christmas season, is even greater.

The carolers at issue in this case are all based on the same thematic idea: the impoverished Dickensian caroler wearing rag-tag clothing. Each of the carolers collections are based on one of several Dickensian archetypes: the pudgy man with a stovepipe hat, the singing woman with a shawl, the drummer boy, and the poor boy with a stocking cap. All the characters carry songbooks, except for the drummer boy, and all are singing in the manner characteristic of depictions of carolers, with open oval mouths and peaceful reverent faces. These figures are common in storybooks and have been repeatedly depicted in Christmas figurines.

## II.

### A.

■ With the foregoing facts in mind, the court turns to the legal standard governing the issuance of preliminary injunctions. In this circuit, whether to grant a preliminary injunction must be determined by applying the test articulated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). Under *Blackwelder* the court considers: 1) the likelihood of irreparable harm to the plaintiff if an injunction is not granted; 2) the likelihood of harm to the defendant if an injunction issues; 3) the likelihood of plaintiff's success on the merits; and 4) the public interest. *Id.* at 193–96; *see also Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir.1994) (discussing *Blackwelder* factors).

■ A prima facie showing of copyright infringement establishes a presumption that the copyright owner has suffered irreparable harm. *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 690 (4th Cir. 1992). Once the plaintiff demonstrates a clear showing of irreparable harm, the court must then balance the relative harms to each party. *Hughes Network Systems*, 17 F.3d at 693–94. The balance of hardships is the "most important determination," *id.* at 693, and dictates, for example, how heavy a burden the plaintiff must face of showing likely success on the merits, *id.; see also Direx Israel, Ltd. v. Breakthrough Medical Corp.*,

952 F.2d 802, 812–13 (4th Cir.1991); *J. Doe v. Shenandoah County School Bd.*, 737 F.Supp. 913 (W.D.Va.1990).

■ The court weighs these factors keeping in mind Judge Wilkinson's warning that preliminary injunctive relief should be the exception, not the rule, and is a remedy that lies within the sound discretion of the court. *See Hughes Network Systems, Inc.*, 17 F.3d at 693–94. Injunctions are often issued without a full record, where the danger is great that the court may err and thereby cause severe hardship to a defendant. *Id.* Where the possibilities of harm to a defendant are great, therefore, the Plaintiff must make a very strong showing of likely success on the merits. *Id.* at 693 (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991)).

### B.

■ In light of the standards outlined above, the court denies granting injunctive relief because the Plaintiffs have failed to meet their burden of showing likely success on the merits. The failure to make a prima facie showing of infringement in copyright cases amounts to a failure to establish irreparable harm, *Service & Training, Inc.*, 963 F.2d at 690, and irreparable harm is a prerequisite to injunctive relief, *Hughes Network Systems*, 17 F.3d at 694.

Irreparable harm aside, the court has not been presented with any credible evidence that the hardships claimed by the Plaintiffs, including reduced sales and resulting layoffs, are attributable to the actions of the Defendants. On the other side of the hardships scale, if an injunction is entered the Defendants will be forbidden from distributing Christmas merchandise, nationwide, during the Christmas season. A bond may be able to protect the Defendants to a certain extent, but the Defendants will also face lost good will and lost reputation. While it is true, as the Plaintiffs argue, that the public interest will be served by the enforcement of the copyright laws, the court must also consider the possibility of wrongfully denying consumers the option of buying the Defendants' less expensive carolers and forcing the Defendants to discard a large volume of mer-

chandise, with benefits to no one but the Plaintiffs and their associates.

■ The Plaintiffs have not met their burden of showing likely success on the merits because the similarities between the carolers are to a great extent dictated by the subject matter that the works portray. When comparing two works in an infringement case, the court must separate the protectable expression unique to the allegedly infringed work from unprotectable expression that is dictated by the idea upon which the work is based. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir.1987). The court then looks to the entire work, including unprotectable expression, to determine if two works are substantially similar, but "no substantial similarity may be found ... where analytical dissection demonstrates that all similarities in expression arise from the use of common ideas." *Id.*

The analysis proceeds in this fashion because copyrights do not protect thematic concepts. "[T]he fact that the same subject matter may be present in two [works] does not prove copying or infringement." *Franklin Mint Corp. v. Nat. Wildlife Art Exchange, Inc.*, 575 F.2d 62, 65 (3d Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). As Nimmer states, "similarity of expression ... which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form will preclude a finding of actual similarity." 3 *Nimmer on Copyright* § 13.03[A] at 13–32–33 (1985) (quoted in *Past Pluto Productions Corp. v. Dana*, 627 F.Supp. 1435, 1444 (S.D.N.Y.1986)).

Where underlying ideas constrain the range of expression open to an artist, the cases impose an exacting standard on a plaintiff to show infringement. *See, e.g., Hedaya Bros., Inc. v. Capital Plastics, Inc.*, 493 F.Supp. 1021, 1024 (S.D.N.Y.1980) (where original design is not new, small changes will protect infringers). The copyright protection afforded to works in which ideas and expression tend to merge is "necessarily narrow." *Shaw v. Linheim*, 919 F.2d 1353, 1360 (9th Cir.1990). Moreover, where a work is derived from "a design in the public domain, the showing of imitation should be stronger ... and even small variations may protect a

subsequent designer from infringement." *Dana*, 627 F.Supp. at 1444 (citing *Millworth Converting Corp. v. Slifka*, 276 F.2d 443, 445 (2d Cir.1960) (public domain) and *Concord Fabrics, Inc. v. Generation Mills, Inc.*, 328 F.Supp. 1030, 1033 (S.D.N.Y.1971)).

Following these principles, case after case has held that substantially similar works do not establish infringement where the underlying ideas lead to an inevitable congruence in the expression of those ideas. *See, e.g., Aliotti*, 831 F.2d at 901 (similar dinosaur toy not infringing because "all similarities in expression arise from the use of common ideas"); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 915–918 (2d Cir.1980) (no infringement where expression of possibly copied idea for a doll toy not substantially similar to the original); *Franklin Mint*, 575 F.2d at 65 (substantial similarity of painting depicting Cardinal bird dictated by similar subject matter and therefore not infringing); *Gund, Inc. v. Smile International, Inc.*, 691 F.Supp. 642, 645 (E.D.N.Y.1988) (floppy stuffed dog toy not infringing because similarities result from similar ideas), *aff'd without op.*, 872 F.2d 1021 (2d Cir.1989); *Dana*, 627 F.Supp. at 1444 (nearly identical Statute of Liberty hat not infringing due to constraints imposed by subject matter).

The court must be careful to note that even small details in expression may be dictated by common ideas or techniques used to produce a work of art. For example, the fact that two dinosaurs had their mouths open in a menacing way did not establish infringement where the facial expressions were dictated by the nature of the Tyrannosaurus Rex, a carnivore. *Aliotti*, 831 F.2d at 901 n. 1. The feel of a work may also be dictated by the underlying subject matter, as in the case of the two cute "floppy plush dog toy[s]" that "flop[ped]" on the floor in similar ways, like puppies. *Gund, Inc.*, 691 F.Supp. at 643–645. Where details correspond because artists use the same techniques or conventions, such similarities do not establish copyright infringement. *See Franklin Mint Corp.*, 575 F.2d at 65 (technique and convention are factors to be considered in separating protectable expression from subject matter of work).

In the case of the carolers, the facial expressions, clothing, posture, and feel of the

figurines is in large part dictated by the archetypes upon which the figurines are based. The fact that the carolers all have their mouths open in similar fashion is dictated by the fact that they are singing, and their facial expressions are dictated by the fact that they are singing religious hymns. Beyond the "inevitable congruences" of expression that are dictated by the various types of impoverished Dickensian carolers that the figurines portray, and the common conventions of clay molding that the Plaintiffs and Defendants use, the details of the Plaintiffs' and Defendants' carolers differ in many respects.

The Plaintiffs' carolers are plain, lacking much of the detail of the Defendants' carolers. This stems in part from the fact that the Plaintiffs' carolers have a charming, crude, folk-art feel to them, which reflects the fact that they are handmade, whereas the Defendants' carolers are the products of a more sophisticated mass-production process. The clothing of the Defendants' carolers is depicted with a rusticated look and a more detailed color scheme, whereas the clothing of the Plaintiffs' carolers is painted in simpler, brighter colors. Also, the clothing of the Defendants' carolers is more intricately textured and realistic. The Plaintiffs' carolers are far bigger than those of the Defendants, and many of the Defendants' carolers are straight and thin "pencil" models that do not resemble the Plaintiffs' carolers at all.

There are various differences between the four types of carolers, beyond differences in color, texture, and size. For example, the singing women carolers are wearing slightly different types of hats, differently colored shawls and dresses, different types of shawls, and are carrying different-looking song books. The Defendants' caroler woman has a wide-eyed look, almost of surprise, whereas the Plaintiffs' caroler looks more somber. (*Compare* P's Ex. 1 and 2 (woman caroler)). The singing uncles with the stove-pipe hats are entirely different. One is wearing glasses and the other is not; one is wearing a different type of jacket and scarf from the other; their hats look different; their pants look different; and their facial expressions look different. The Plaintiffs' uncle looks like he is an older man than the Defendants'

caroler. (*Compare* P's Ex. 1 and 2 (uncle)). Next, the Plaintiffs' drummer is swaying, with his eyes closed in a peaceful way, whereas the Defendants' drummer is upright and staring out with his eyes wide-open. The Plaintiffs' drummer boy does not have drum sticks, whereas the Defendants' drummer boy does. The Defendants' drummer boy has a more detailed and intricately painted drum, drum strap, scarf, hat, jacket, and pants. The Defendants' drummer boy does not have freckles. (*Compare* P's Ex. 1 and 2 (drummer boy)). Finally, the singing boys are wearing different types of jackets, their stocking caps are depicted in different ways, their scarves drape around their bodies differently, and their song books look different. The Defendants' boy appears more gaunt than the Plaintiffs' boy, and his face tilts in a different way. The Defendants' boy has freckles. (*Compare* P's Ex. 1 and 2 (singing boy)).

■ Based on all of the foregoing differences, and the general appearance of the figurines, the court cannot conclude that the Plaintiffs have demonstrated a strong likelihood of success on the merits. The "total concept and feel of the works," *Aliotti*, 831 F.2d at 901, beyond that which results from the convergence of expression and subject matter, is different. The court is unpersuaded by the Plaintiffs' expert witness, who stated either that the Defendants' collection was "unquestionably a copy" or "exactly similar." First, while expert testimony is useful to establish similarity of ideas, techniques, and conventions in two works, and to enable the court to demarcate the line between those elements that are in the public domain and those elements that are unique to a particular artist and work of art, once such facts have been established expert testimony is of limited value in determining substantial similarity. *See Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987) (expert testimony permissible in connection with the first step of the substantial similarity analysis to show similarity of ideas but not called for under the second step in which substantial similarity is measured by a different standard—the response of the ordinary, reasonable person). Second, the expert appeared to base most of his conclusions as to substantial similarity on the fact that the

*types* of figurines were very similar, and that the authors used similar *techniques* to create the figurines. These elements of expression are not protectable. The expert stated that "the character is the issue here" and the "approach" used to create the figurines was the same, but admitted that many of the figurines' features differ.

In any case, the court must use its own judgment to determine whether these Dickens carolers are substantially similar within the meaning of the copyright laws. Based on the analysis above, and a comparison of all of the figurines, the court cannot determine that the Plaintiffs have made an adequate showing of infringement to justify a preliminary injunction. Though the court previously granted a temporary restraining order in this case, based on the superficial similarities of the carolers, upon further reflection, evidence, and argument, the court is of the opinion that the similarities of the works at issue here are primarily attributable to similar subject matter. Beyond the unprotectable elements of expression dictated by the Dickensian subject matter, the elements of expression in the figurines are not similar enough to justify preliminary injunctive relief. Accordingly, the motion for a preliminary injunction shall be denied.